# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL COOPER, <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Action No. 19-1449 (JEB) |

## MEMORANDUM OPINION

Tequila and the summer heat often prove a troublesome pair. Here, though, tequila is not to blame for our Plaintiff's plight; rather, it is the conduct of Metropolitan Police Department officers in response to a small-scale open-container violation. On a warm May evening in 2018, Plaintiff Samuel Cooper planned to attend a cookout in his neighborhood. He was met, instead, with a violent police encounter that left him with serious injuries and led to this excessive-force suit under 42 U.S.C. § 1983 and District of Columbia common law. While he initially identified numerous defendants, at this stage only Officer Karina Phillip and Officer Wilmino Pantaleon remain.

These Defendants now seek summary judgment, asserting that they are shielded from liability by qualified immunity because they acted as reasonable police officers when arresting Plaintiff. While many cases like this one can be resolved swiftly at this stage because of the ultimate neutral witness — body-worn-camera footage — officers here activated their cameras too late to capture the full encounter. Even without such clarity, the Court finds that Defendants have met their burden regarding some of the claims against them. On others, however, Cooper has raised sufficient facts suggesting unconstitutional use of excessive force to overcome

1

Defendants' qualified-immunity defense. The Court thus grants Defendants' Motion in part and denies it in part.

I.  **Background**

While BWC footage gives the Court a clear view of much of this incident, several critical points in this story remain in dispute. To fill such gaps, the Court views the facts, as it must, in the light most favorable to Plaintiff. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

A.  Initial Encounter

On the evening of May 19, 2018, Cooper exited a car on 15th Street Northeast en route to a nearby cookout. See ECF No. 37-1 (Def. Statement of Facts), ¶ 1; ECF No. 39-2 (Pl. Resp. to Statement of Facts), ¶ 1. He was carrying an open bottle of tequila and a red solo cup. See DSF, ¶ 2; PRSF, ¶ 2. Plaintiff recalls that soon after leaving the car, he was approached by Officer Pantaleon, who remarked, "We're not going to have this today." ECF No. 39-5 (Deposition of Samuel Cooper) at 25:2. When it "dawned" on Cooper that the officer was referring to the open container of tequila he was carrying, he turned around to return it to the car. Id. at 35:22, 36:1–2. At this point, Officer Pantaleon "grabbed" him by the hood of his jacket and "slammed" him to the ground. Id. at 36:4.

The officers paint a different picture. According to Phillip, she noticed Cooper with the tequila, and Pantaleon exited their car to respond to it. See ECF No. 39-6 (Deposition of Karina Phillip) at 30:4–9. Phillip followed, remaining a bit behind. Id. at 32:6–12. After a conversation between Plaintiff and Pantaleon, the officer grabbed him, and Phillip tried to assist in restraining him. Id. at 32:3–22, 41:1–2, 14–16. Pantaleon testified that at this point Cooper was "pulling, pushing, doing everything he [could] to get away from [him.]" ECF No. 39-7 (Deposition of Wilmino Pantaleon) at 37:1–2. After Plaintiff refused to comply with commands that he place

his hands behind his back, Pantaleon felt he had no choice but to conduct a "takedown" of Cooper. See ECF No. 37-2 (Defense Exhibits for MSJ), Exh. 2 (Pantaleon Responses to Interrogatories) at 6. Pantaleon describes a fairly intense struggle prior to the takedown, recalling that Plaintiff "started violently swinging his arms and body" while "actively resisting." Id. Phillip remained a beat behind her partner throughout this ordeal, providing surprisingly little clarity on exactly how Cooper ended up on the ground. See Phillip Dep. at 43:8–12 ("I don't know if he fell or . . . if Pantaleon took him to the ground.").

During this sequence, no officer had activated a body-worn camera, in violation of Metropolitan Police Department policy. See Pantaleon Dep. at 15:9–17 ("I was supposed to turn [the body-worn camera] on . . . as soon as I [was] getting ready to approach."); see also Phillip Dep. at 63:21–22 (officers are supposed to turn on their cameras "as soon as possible when [they] get a call for service"). The Court thus is left with the conflicting views of the principals, unaided by Phillip's lack of recollection.

    B. Arrest

Once Plaintiff was on the ground, the cameras began rolling. The viewer is met with a scene of chaos: Cooper on his stomach pinned to the ground, bystanders screaming, and officers surrounding Plaintiff and kneeling on top of him, yelling at him. The majority of this struggle seems to involve officers' efforts to get Plaintiff, who is lying on his arms, to release them for handcuffing. The officers testify that the situation escalated in part because they saw Cooper throw a gun under a nearby car during the struggle. See Pantaleon Interrog. at 6–7; Def. Exh. 3 (Phillip Responses to Interrogatories) at 6. Although Cooper denies ever having a gun, see Cooper Dep. at 44:12–21, he admits that he was always able to provide his arms and that they were never pinned under his body. Id. at 48:12–19. Officers nevertheless went to fairly

3

aggressive lengths to complete the arrest, including, in Pantaleon's case, striking Cooper in the face at least twice. See Def. Exhs. 4–8 (Body Worn Camera Footage); Pantaleon Dep. at 40:12–19; ECF No. 39-8 (Samuel Cooper's Responses to Interrogatories) at 8; Phillip Dep. at 54:10–20. The struggle continued for several minutes until the officers were finally able to secure the handcuffs. See BWC Footage; Phillip Dep. at 59:3.

Officers then transported Plaintiff to Washington Hospital Center, where he was treated for injuries, including acute back pain, right shoulder pain, and a subconjunctival hemorrhage of the right eye. See Compl., ¶¶ 24–25; Cooper Interrog. at 15–16. That same evening, he was transported to a holding cell, where he was detained until he was charged with one count of Carrying a Pistol Without a License on May 21, 2018, and released after a preliminary hearing the next day. United States v. Cooper, D.C. Super. Ct., No. CF2 7634, 5/21/2018–5/22/2018 Entries; see also Compl., ¶¶ 27–29. Cooper was placed in the High Intensity Supervision Program until his preliminary hearing on June 11, see ECF No. 39-1 (Pl. Opp.) at 4, when the District of Columbia Superior Court dismissed the charge for lack of probable cause. Cooper, No. 2018 CF2 7634, 6/11/2018 Entries; see also Compl., ¶ 32.

C. Procedural History

This suit began with seven claims: (I) Section 1983 for excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments; (II) Section 1983 for malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments; (III) common-law assault; (IV) common-law battery; (V) common-law false arrest/false imprisonment; (VI) common-law intentional infliction of emotional distress; and (VII) *respondeat superior*. See Compl., ¶¶ 49–123. The first six counts are alleged against the six officers Plaintiff was able to identify on the scene — Officers Pantaleon, Phillip, and four others. The District of Columbia is named only in

4

the *respondeat superior* count. Id., ¶¶ 121–23. In August of 2019, the Court granted Defendants' Partial Motion to Dismiss, tossing out Cooper's Fifth Amendment and *respondeat superior* claims. See 8/26/2019 Min. Order. In March of 2021, Cooper dismissed his claims against the four other officers. See 3/22/2021 Min. Order; see also ECF Nos. 33–36 (Notices of Voluntary Dismissal). Because the District is no longer a named defendant in any remaining count, the Court need only consider the allegations against Phillip and Pantaleon, who now move for summary judgment.

## II. Legal Standard

While Defendants have filed concurrent Motions for Judgment on the Pleadings and for Summary Judgment, because the arguments fundamentally depend on facts contained in the record, the Court will consider only their Motion for Summary Judgment. See Fed. R. Civ. P. 12(c), 56.

Courts must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Liberty Lobby, 477 U.S. at 247–48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence presented would permit a reasonable jury to return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895; see also Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials

5

cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In viewing this record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The Court, in turn, must "eschew making credibility determinations" and avoid "weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant must put forth evidence that would permit a reasonable jury to find in his favor. Laningham, 813 F.2d at 1242.

**III.    Analysis**

In seeking summary judgment, Defendants argue that they should be shielded from this entire suit via qualified immunity. The Court addresses each of the six remaining counts separately, distinguishing between the two officers' conduct where appropriate.

    A.   Section 1983: Excessive Force (Count I)

Cooper first seeks damages from Phillip and Pantaleon for alleged violations of his constitutional rights under 42 U.S.C § 1983. The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

6

> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress . . . .

All parties agree, and rightly so, that the Fourteenth Amendment does not apply to the District of Columbia or its employees. Poindexter v. D.C. Dep't of Corrections, 891 F. Supp. 2d 117, 125 (D.D.C. 2012); see also Pl. Opp. at 5. The Court thus need only consider Plaintiff's Fourth Amendment claim under Section 1983, where he asserts that Defendants unconstitutionally used excessive force. See Compl., ¶¶ 56, 58–68.

In asking for summary judgment, Pantaleon and Phillip seek refuge in the doctrine of qualified immunity — "an entitlement not to stand trial under certain circumstances." Mitchell v. Forsyth, 472 U.S. 511, 525 (1985). For any alleged constitutional violation, the immunity analysis proceeds in two parts. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the court then asks "whether the right [was] clearly established" — i.e., "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201–02; Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). That is, "in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640. In appealing to pre-existing law, the party asserting injury need not identify cases with "materially similar" facts where violations have occurred. Johnson v. District of Columbia, 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Rather, he must show that the state of the law when the incident occurred gave the officer fair warning of his conduct's unconstitutionality. Id.

Although the Court may tackle the two immunity inquiries in either order, Pearson v. Callahan, 555 U.S. 223, 236 (2009), no matter the sequence, "a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the [constitutional violation] is so apparent that no reasonable officer could have believed in the lawfulness of his actions." Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

Law-enforcement officials run afoul of the Fourth Amendment's excessive-force prohibition when they use more force than is objectively reasonable to arrest a suspect. Tennessee v. Garner, 471 U.S. 1, 7–8 (1985); Robinson v. District of Columbia, 130 F. Supp. 3d 180, 193 (D.D.C. 2015) ("[Plaintiff] must prove that the force used to carry out that seizure was objectively unreasonable.") (emphasis omitted). In assessing reasonableness, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court laid out four considerations to guide this inquiry: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others, and" (3) "whether he is actively resisting arrest or" (4) "attempting to evade arrest by flight." Id. at 396.

It is important to note, however, that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a[n] [individual's] constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.). And even if a genuine issue exists as to whether force was indeed excessive, officers may still succeed on qualified immunity's second prong unless the "alleged use of excessive force violated a clearly

established rule." Johnson, 528 F.3d at 976. The Court here considers both prongs, concluding that while Pantaleon cannot prevail, Phillip did not participate in conduct that violates any clearly established right.

As a threshold issue, the Court addresses Defendants' position that the presence of BWC footage negates any potential dispute of material fact. The officers argue that this case is fundamentally similar to Scott v. Harris, 550 U.S. at 378–79, where video coverage was sufficient to establish that the police narrative was factually true and the plaintiff's was inconsistent with it. See also Def. MSJ at 10–11. Unlike in Scott, however, where footage "captur[ed] the events in question," 550 U.S. at 378–79, BWC footage here fails to cover a substantial portion of the encounter and resolve the factual disputes in play. With this in mind, the Court analyzes each Defendant individually.

*1. Officer Phillip*

As Cooper concedes that Phillip took no part in his takedown, the Court considers her conduct only after Plaintiff was on the ground. See Cooper Dep. at 36:14–15 ("[Officer Phillip] didn't get out of the car. [Officer Pantaleon] was the only one . . . ."). The only specific allegation against Phillip seems to be that she "held [Cooper's] legs and upper body" after the takedown, as did four other officers, all of whom are no longer parties to this case. See Cooper Interrog. at 7. Even viewing the facts most favorably to Plaintiff, there is thus no basis for concluding that she committed any constitutional violation, much less one "so apparent that no reasonable officer could have believed the lawfulness of [her] actions." Wardlaw, 1 F.3d at 1303. Summary judgment is warranted for her on this count.

*2. Officer Pantaleon*

The result is different for Officer Pantaleon, who is the main character in Plaintiff's account, given that he took Cooper down and struck him in the face. See Cooper Dep. at 36:15–18, 41:4–9. As to these two alleged instances of excessive force, the Court considers whether, for purposes of Defendants' Motion, a Fourth Amendment violation occurred and whether any such right was clearly established.

a. Violation of the Fourth Amendment

The first inquiry fundamentally depends on reasonableness, and the Graham factors put Pantaleon in a tough position. First, the suspected crime at issue for the takedown— namely, Possession of an Open Container of Alcohol (POCA) — is decidedly minor, a misdemeanor carrying a maximum imprisonment term of no more than 60 days. See D.C. Code § 25-1001(d). A reasonable jury could find the force disproportionate.

The second Graham factor — whether the subject posed a safety risk to officers or others — also gives little aid to the defense. "[T]urn[ing] away from officers," Def. MSJ at 13, is the sole identified "threatening" conduct prior to takedown, and this hardly seems egregious. Plaintiff does not deny this action, and states that he did so to return the bottle in question to the car. See Cooper Dep. at 36:1–2. At this point in the encounter, there is no record evidence to suggest that Officer Pantaleon saw a gun or believed that Cooper had one. This version of the facts offers no basis for an officer's reasonable belief that Cooper posed a safety risk justifying the sort of takedown that he testifies took place; indeed, his actions were rooted in his desire to remedy the very conduct to which the officer objected.

Similarly, although Pantaleon alleges that Plaintiff posed a safety threat after takedown, he finds little corroboration by way of BWC footage or his fellow officers' testimony. Pantaleon

10

and Phillip both state that they witnessed Plaintiff throwing a gun under a nearby car shortly after the takedown, see Pantaleon Interrog. at 6; Phillip Interrog. at 6, and that the gun was later recovered by another officer. See Pantaleon Interrog. at 7. But even Pantaleon's fellow officers disagree that the circumstances justified multiple strikes to Plaintiff's face. Compare Pantaleon Interrog. at 6–7 ("Because I feared that the subject might be concealing another firearm or another weapon, I struck the subject with approximately three control straight strikes . . . ."), with Phillip Dep. at 55:9–10 ("[T]here was no need to strike [Plaintiff]"). Even if Cooper was armed at some point — which he denies, see Cooper Dep. at 44:12–21 — there is no evidence that he remained so after the alleged gun toss, which occurred well before the strikes. See Pantaleon Interrog. at 6–7 (describing Plaintiff "tossing" a gun shortly after takedown). Indeed, at the time of the strikes, footage provides a clear view of Plaintiff being pinned to the ground by officers and unable to pose a threat.

The last two Graham factors — active resistance and evasion by flight — are a little more equivocal. Although Cooper maintains that he was cooperative, Pantaleon has consistently stated that he was attempting to flee and that he actively resisted, thus necessitating a takedown. Id. at 6 (stating that Plaintiff "actively resist[ed]" and "refused to comply" with verbal commands). Where the officers describe potential flight, however, Plaintiff states that he was merely walking back to the car to return the open container in question. See Cooper Dep. at 36:1–2. Taking Plaintiff's view, the Court cannot conclude that an imminent flight risk justified the takedown.

Once on the ground, BWC footage provides some support for the officers' assertions that Plaintiff resisted arrest by refusing to provide his arms. This Circuit has nevertheless held that merely being "loquacious" and "cr[ying]" would not usually constitute "resist[ing] arrest or

11

tr[ying] to free [one]self from the policemen's grip," DeGraff v. District of Columbia, 120 F.3d 298, 302 (D.C. Cir. 1997), and Plaintiff's recitation of the facts suggests that he did no more than that. See Cooper Dep. at 48:3–14. The BWC footage similarly does not create the impression that Cooper was trying to "free himself from the policeman's grip." DeGraff, 120 F.3d at 302. Even with indisputable evidence of some low-level resistance, given Plaintiff's position on the ground and the level of control officers clearly had over him, any such resistance cannot justify Pantaleon's strikes.

This is not to suggest that all force during an arrest is impermissible. The officers had a legitimate interest in arresting Cooper, no matter how minor the crime. Hedgpeth v. Rahim, 213 F. Supp. 3d 211, 225 (D.D.C. 2016). The reality of placing someone under arrest, moreover, often necessitates some force. Yet a reasonable jury could find that the conduct here extended well beyond that. A takedown under these circumstances seems manifestly opposed to a Fourth Amendment right of security in one's person. In addition, to strike someone, particularly someone forcibly pinned to the ground and surrounded by multiple officers, is categorically different from aggressive conduct that is necessary to execute an arrest. Viewing the facts most favorably to Plaintiff, this conduct constitutes a violation of his Fourth Amendment right to be free from unnecessary and excessive force during an arrest.

### b. Clearly Established Right

The second question hinges on whether the takedown and strikes "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, the Court must look to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (emphasis added); Johnson, 528 F.3d at 975 ("It will not

do to ask whether [Plaintiff] had a right to be secure in his person against unreasonable seizures."). Here, the relevant inquiry is whether a reasonable officer should have known that it was unlawful to tackle a largely cooperative citizen and then to strike him multiple times once he was already on the ground and restrained. Such a question supplies the answer.

It is well established that "the state may not perpetrate violence for its own sake . . . [and f]orce without reason is unreasonable." Johnson, 528 F.3d at 977. But in circumstances where an individual does not comply with an arresting officer's commands, the officer has authority to use "some degree of physical coercion." Graham, 490 U.S. at 396. This Circuit has also held that the use of takedowns is generally lawful when a suspect is resisting arrest. Jackson v. District of Columbia, 327 F. Supp. 3d 52, 66 (D.D.C. 2018); see also Hedgpeth v. Rahim, 893 F.3d 802, 808–11 (D.C. Cir. 2018) (affirming this Court's determination that qualified immunity was warranted where officers resorted to tactical takedown on plaintiff resisting arrest).

The record, once again, is equivocal on what exactly happened at the takedown stage. Construing the facts most favorably to the non-movant, the Court cannot presume that Plaintiff was not compliant or resisting arrest. Any reasonable officer would have known that a takedown of a non-agitated person not attempting to flee or resist is impermissible.

As to the strikes, the use of violence on an already subdued suspect is generally impermissible. Id. (finding that kicking suspect after he was on ground and subdued violated clearly established law). BWC footage provides clear evidence that Cooper was on his stomach and surrounded by officers, most of whom were forcefully restraining him. Even though Cooper certainly did not aid officers in handcuffing him, and, as previously discussed, they had every right to use some force, a reasonable officer would have known that multiple direct strikes to the face were improper. In a situation involving no remaining flight risk or real risk of danger to

13

officers, Pantaleon's strikes seem patently unreasonable. Phillip agrees, testifying that in her opinion, "there was no need to strike [Plaintiff.]" Phillip Dep. at 55:9–10. Plaintiff's extensive injuries thereafter further testify to the intensity of those strikes and manifest that this was not a mere blurred line between appropriate and inappropriate force; Pantaleon violated clearly established and understood constitutional rights against such unjustified violence.

In light of the above analysis, the Court will reject his qualified-immunity defense at this stage.

### B. Assault and Battery (Counts III and IV)

Plaintiff's common-law assault and battery claims similarly involve an inquiry into the reasonableness of the officers' conduct — *i.e.*, whether the force used was justified by the circumstances of the arrest. Largely analogous to the qualified-immunity defense above, officers may invoke a "qualified privilege" to tort liability. Williams v. District of Columbia, 268 F. Supp. 3d 178, 194 (D.D.C. 2017) (citing District of Columbia v. Chinn, 839 A.2d 701, 705–06 (D.C. 2003)). Assault is "an intentional and unlawful attempt or threat . . . to do physical harm to the victim." Evans-Reid v. District of Columbia, 930 A.2d 930, 937 (D.C. 2007) (quoting Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993)). Battery is "an intentional act that causes a harmful or offensive bodily contact." Id. (quoting Jackson v. District of Columbia, 412 A.2d 948, 955 (D.C. 1980)). In the District of Columbia, "a police officer effecting an arrest commits a battery." Jackson, 327 F. Supp. 3d at 68 (quoting Chinn, 839 A.2d at 706). "If the officer does not use force beyond that which the officer reasonably believes is necessary," however, "he is clothed with privilege." Id. This inquiry is similar to an excessive-force inquiry under Section 1983. Id. (citing Dormu v. District of Columbia, 795 F. Supp. 2d 7, 28 (D.D.C. 2011)).

14

Faced with the same conduct discussed under excessive force, the same conclusion follows. Just as the Court could not determine that Pantaleon's conduct was objectively reasonable under the Fourth Amendment, it cannot deem that same conduct reasonable for purposes of Cooper's assault and battery claims. Williams, 268 F. Supp. 3d at 194. Viewing the facts most favorably to Plaintiff, the use of excessive force belies Pantaleon's position that his actions were necessary or he reasonably believed them to be so. As Pantaleon's qualified-privilege defense cannot defeat Cooper's assault and battery counts at this stage, the Court will deny summary judgment.

C. Section 1983: Malicious Prosecution (Count II)

Cooper also alleges Section 1983 malicious prosecution, maintaining that he was arrested, subsequently detained for three days, and placed in the High Intensity Supervision Program in violation of his constitutional rights. This Circuit has held that malicious-prosecution claims under Section 1983 may only be sustained where a plaintiff was "unreasonably seized" without "probable cause." Amobi v. District of Columbia Dep't of Corrections, 755 F.3d 980, 993 (D.C. Cir. 2014) (internal quotation marks omitted); see also Pitt v. District of Columbia, 491 F.3d 494, 511 (D.C. Cir. 2007) (finding ten days in halfway house "seizure" for purposes of Section 1983 malicious-prosecution claims); Mehari v. District of Columbia, 268 F. Supp. 3d 73, 82 (D.D.C. 2017) (same for several-hour detention and "burdensome limitations on [plaintiff's] freedom as a condition of his pretrial release"). "[A]n officer with an objectively reasonable belief that an arrest was supported by probable cause," however, "is entitled to qualified immunity against a claim of [Section 1983] malicious prosecution." Cruz v. City of New York, 232 F. Supp. 3d 438, 457 (S.D.N.Y. 2017) (citing Bonide Prods., Inc. v. Cahill, 223 F.3d 141, 146 (2d Cir. 2000)).

As to the arrest, the officers reasonably believed that Cooper was in possession of an open container of alcohol in a public place. This is a clear violation of District law, which provides that "no person in the district shall drink an alcoholic beverage or possess in an open container an alcoholic beverage in or upon . . . [a] street, alley, park, or sidewalk, or parking area." D.C. Code § 25-1001(a)(1). Both officers testified to seeing Cooper on a public street carrying an open container of alcohol. See id. § 25-101(35). Given such probable cause, the officers may invoke qualified immunity as to the arrest itself.

The probable cause for POCA does not apply to the events following Cooper's arrest, however, as his detention and supervision were based solely on the gun charge. Cooper, No. 2018 CF2 7634, 5/21/2018–5/22/2018 Entries. Although the parties dispute the underlying facts surrounding the gun, Plaintiff does not cite any facts (or make any argument) casting doubt on the officers' contention that they reasonably believed that he was in possession of a weapon. See DSF, ¶¶ 9, 12; ECF No. 40-1 (Def. Resp. to Pl. Statement of Facts), ¶ 2. They thus had a reasonable basis to believe that there was probable cause to arrest Cooper for Carrying a Pistol Without a License. Even though that charge was ultimately dismissed, Cooper, No. 2018 CF2 7634, 6/11/2018 Entries, the officers' reasonable belief that they were correctly charging Plaintiff defeats his claim that they violated a clearly established law or constitutional right. As such, they may invoke qualified immunity here, and the Court will thus grant summary judgment.

D. False Arrest/False Imprisonment (Count V)

Plaintiff also maintains that his arrest constitutes false arrest under D.C. common law. False arrest is defined as the "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." Harris v. U.S. Dep't of Veterans

16

Affairs, 776 F.3d 907, 911–12 (D.C. Cir. 2015) (citing Edwards v. Okie Dokie, Inc., 473 F. Supp. 2d 31, 44 (D.D.C. 2007)). Probable cause is an affirmative defense to a claim of false arrest under D.C. law. Scales v. District of Columbia, 973 A.2d 722, 729 (D.C. 2009). As just explained, Plaintiff's POCA violation, no matter how minor, created probable cause to effect an arrest, thus defeating this claim as to the arrest. Because Plaintiff only alleges false arrest in his Complaint and does not put forth any allegations of false imprisonment subsequent to the arrest, the Court need not go further. It will grant summary judgment on this count.

### E. Intentional Infliction of Emotional Distress (Count VI)

Cooper last asserts that the public nature of his arrest and the subsequent judicial proceedings have caused him mental anguish that rises to the level of intentional infliction of emotional distress. To prevail on an IIED claim, he must prove: (1) extreme and outrageous conduct that (2) intentionally or recklessly (3) caused him to suffer severe emotional distress. Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997). The alleged conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community." District of Columbia v. Tulin, 994 A.2d 788, 800 (D.C. 2010) (citation omitted). This inquiry involves consideration of "applicable community standards, the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place." Duncan, 702 A.2d at 211 (citing King v. Kidd, 640 A.2d 656, 668 (D.C. 1993)).

Plaintiff does not provide any factual assertions to support his allegation that Phillip caused him emotional distress during the incident. Similarly, because his arrest was justified by probable cause, any emotional distress arising from it cannot form the basis of a claim for

17

"extreme or outrageous" conduct. Kotsch v. District of Columbia, 924 A.2d 1040, 1046 (D.C. 2007).

Even assuming that Plaintiff satisfies the first two elements as to the rest of the events — and that "Fourth Amendment violation[s are] necessarily outrageous" — the remaining question is whether Cooper has shown distress severe enough to maintain this claim. Garay v. Liriano, 943 F. Supp. 2d 1, 23 (D.D.C. 2013). In general, "'embarrassment and difficulty' do not approach the level" required to support an IIED claim. Id. (cleaned up) (quoting Waldon v. Covington, 415 A.2d 1070, 1078 (D.C. 1980)); see also Wood v. Neuman, 979 A.2d 64, 78 (D.C. 2009) (finding that plaintiff who was "horrified," "constantly crying and almost sleepless," "shaken at her arrest," and "embarrassed at having been made out to be a 'pariah' in the neighborhood" could not maintain IIED claim because distress was insufficiently severe); Bakeir v. Capital City Mortg. Corp., 926 F. Supp. 2d 320, 341 (D.D.C. 2013) (holding that plaintiff who experienced only "general distress, embarrassment, and unhappiness . . . did not present evidence that she suffered emotional distress so acute that harmful physical consequences might result") (internal quotation marks omitted).

Cooper no doubt endured a traumatic ordeal, and the Court does not diminish the emotional distress he has experienced in the aftermath. Viewing the facts most favorably to him, however, this distress does not rise to the level of severity generally needed to maintain an IIED claim. Cooper only recounts difficulty sleeping as a result of his memories of the encounter and embarrassment from "people . . . talking down on [him]," Cooper Dep. at 79:12–18; he does not provide the Court with any facts that might lead a reasonable trier of fact to believe this is the kind of distress that "no reasonable person should be expected to endure." Brewton v. City of

New York, 550 F. Supp. 2d 355, 369 (E.D.N.Y. 2008).  As such, the Court will grant summary judgment to Defendants on this count.

## IV. Conclusion

The Court, accordingly, will grant Defendants' Motion for Summary Judgment to Officer Phillip entirely and to Officer Pantaleon on counts II, V, and VI — malicious prosecution, false arrest/false imprisonment, and intentional infliction of emotional distress — and deny it on counts I, III, and IV — Section 1983 excessive force, assault, and battery — as they pertain to Officer Pantaleon.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 9, 2021